## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| ALYECE CUMMINGS and DANIEL LAPKA, Individually and On Behalf of All Others Similarly Situated, | : <br> : <br> : <br> : Case No. 16-cv-00647-HE |
| Plaintiffs, | : CLASS ACTION <br> : |
| v. | : <br> : |
| CHESAPEAKE ENERGY CORP., et al., | : <br> : |
| Defendants. | : <br> : |

**PLAINTIFFS' MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS
<u>AMENDED CLASS ACTION COMPLAINT</u>**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................... ii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ......................................................................................................... 8

I.      LEGAL STANDARD ................................................................................ 8

II.     THE NO-ACTION CLAUSE DOES NOT BAR PLAINTIFFS' CLAIMS NOR ARE PLAINTIFFS PRECLUDED FROM BRINGING SUIT ABSENT AN EVENT OF DEFAULT ............................................................ 9

III.    PLAINTIFFS HAVE PROPERLY ALLEGED INJURY RESULTING FROM THE EXCHANGE OFFER .............................................................. 11

IV.    DEFENDANTS VIOLATED TIA SECTION 316(B) AND SECTION 6.07 OF THE INDENTURES ...................................................................... 14

      A.  The TIA Was Implemented to Protect Holders' Unconditional Rights to Receive Payment of Principal and Interest ..................................................... 15

      B.  The TIA Protects Holders' Payment Rights that Have Been Impaired or Affected by an Issuer's Out-of-Court Debt Restructuring Activities ............ 15

      C.  Plaintiffs Have Properly Pleaded a TIA Claim ............................................... 17

V.     DEFENDANTS BREACHED SECTION 4.09 OF THE INDENTURES BY CONSUMMATING THE EXCHANGE OFFER ................................... 19

VI.    THE COMPLAINT STATES A CLAIM FOR VIOLATION OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING .......... 21

VII.   THE COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT .. 23

VIII.  THE COMPLAINT STATES A DECLARATORY JUDGMENT CLAIM 23

CONCLUSION ................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Cases**  **Page(s)**

*Acumen Re Mgmt. Corp. v. Gen. Sec. Nat. Ins. Co.*,
  No. 09-cv-01796, 2012 WL 3890128 (S.D.N.Y. Sept. 7, 2012) .................................. 12

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..................................................................................... 8, 9

*Bank of N.Y. Mellon v. Realogy Corp.*,
  979 A.2d 1113 (Del. Ch. 2008) .................................................................... 21

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007) ..................................................................................... 8, 9

*Bluebird Partners, L.P. v. First Fid. Bank, N.A.*,
  85 F.3d 970 (2d Cir. 1996) ........................................................................... 15

*BOKF, N.A. v. Caesars Entertainment Corp.*,
  144 F. Supp. 3d 459 (S.D.N.Y.) ............................................................. passim

*Brady v. UBS Fin. Servs., Inc.*,
  538 F.3d 1319 (10th Cir. 2008) ............................................................. passim

*Chase Manhattan Bank, N.A. v. Keystone Distribs.*,
  873 F. Supp. 808 (S.D.N.Y. 1994) ............................................................... 22

*Cont'l Cas. Co. v. State of N.Y. Mortg. Agency*,
  No. 94-cv-8408, 1998 WL 513054 (S.D.N.Y. Aug. 18, 1998) ...................... 9

*Coosewoon v. Meridian Oil Co.*,
  25 F.3d 920 (10th Cir. 1994) .......................................................................... 8

*Dalton v. Educ. Testing Serv.*,
  87 N.Y.2d 384 (1995) ................................................................................... 22

*Delaware Cty. v. Leatherstocking Healthcare, LLC*,
  110 A.D.3d 1211 (N.Y. App. Div. 2d Dep't 2013) ...................................... 23

*E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.*,
  241 F.3d 154 (2d Cir. 2001) ......................................................................... 24

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
   837 F. Supp. 2d. 162 (S.D.N.Y. 2011) ......................................................... 11

*Fantozzi v. Axsys Techs., Inc.*,
   No. 07–CV–2667(LMM),
   2008 WL 4866054 (S.D.N.Y. Nov.6, 2008) .................................................. 23

*Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*,
   No. 99 CIV 10517, 1999 WL 993648 (S.D.N.Y. Nov. 2, 1999) ........................... passim

*Fixed Income Shares: Series M v. Citibank N.A.*,
   130 F. Supp. 3d 842 (S.D.N.Y. 2015) ........................................................ 21

*Goldman v. Simon Prop. Grp., Inc.*,
   58 A.D.3d 208 (N.Y. App. Div. 2d Dep't 2008) ............................................. 24

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
   No. 03-cv-5808, 2008 WL 744823 (S.D. Tex. Mar. 19, 2008) .............................. 10

*Kramer v. Lockwood Pension Servs.*,
   653 F. Supp. 2d 354 (S.D.N.Y. 2009) ........................................................ 24

*Legum v. Russo*,
   133 A.D.3d 638 (N.Y. App. Div. 2d Dep't 2015) ........................................... 20

*Magten Asset Mgmt. Corp. & Law Debenture Trust Co. v. Nw. Corp.*,
   313 B.R. 595 (Bankr. D. Del. 2004) .......................................................... 17

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*,
   111 F. Supp. 3d 542 (S.D.N.Y. 2015) ............................................. 16, 17, 18

*Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*,
   75 F. Supp. 3d 592 (S.D.N.Y. 2014) ............................................... 3, 16, 17

*Medinol Ltd. v. Boston Scientific Corp.*,
   346 F. Supp. 2d 575 (S.D.N.Y. 2004) ........................................................ 12

*MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entertainment Corp.*,
   80 F. Supp. 3d 507 (S.D.N.Y. 2015) ..................................................... passim

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
   693 F.3d 145 (2d Cir. 2012) .............................................................. 12, 13

*Oaktree Capital Mgmt., LLC v. Spectrasite Holdings, Inc.*,
    No. 02-cv-548 (JJF), 2002 WL 32173072 (D. Del. June 25, 2002) ............................ 18

*Okla. Police Pension and Ret. Sys. v. U.S. Bank Nat'l Ass'n*,
    291 F.R.D. 47 (S.D.N.Y. 2013) .......................................................... 2, 12, 14

*Penn. Mut. Life Ins. Co. v. Wolk*,
    739 F. Supp. 2d 387 (S.D.N.Y. 2010) ............................................................ 25

*Policeman's Annuity & Benefit Fund of City of Chi. v. Bank of Am., NA*,
    904 F. Supp. 2d 536 (S.D.N.Y. 2012) ........................................................... 13

*Policemen's Annuity & Ben. Fund of City of Chi. v. Bank of Am., NA*,
    943 F. Supp. 2d 428 (S.D.N.Y. 2013) ........................................................... 21

*Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chi. v.
Bank of N.Y. Mellon*,
    775 F.3d 154 (2d Cir. 2014) ....................................................................... 21

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
    23 N.Y.3d 549 (N.Y. 2014) ........................................................................... 9

*Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*,
    109 F. Supp. 3d 587 (S.D.N.Y. 2015) ........................................................... 12

*Whitebox Convertible Arbitrage Partners, L.P. v. World Airways, Inc.*,
    No. 04-cv-1350, 2006 WL 358270 (N.D. Ga. Feb. 15, 2006)......................... 2

*YRC Worldwide, Inc. v. Deutsche Bank Trust Co. Americas*,
    No. 10-2106, 2010 WL 2680336 (D. Kansas July 1, 2010) ........................... 17

## Statutes

The Trust Indenture Act, §316(b), 15 U.S.C. § 77ppp(b) ......................... passim

28 U.S.C. § 2201(a) ....................................................................................... 24

The Securities Act of 1933, 15 U.S.C. §77a, *et. seq.* ............................. 1, 4, 13

## Rules

Fed. R. Civ. P. 15(a)(2) ................................................................................... 1

iv

Fed. R. Civ. P. 8.................................................................................................... 1, 8

The Securities Act Rule 144 ................................................................................. 5

## **Other Authorities**

*Commentaries on the Model Debenture Indenture Provisions 1965 Model Debenture Indenture Provisions All Registered Issues 1967 and Certain Negotiable Provisions Which May Be Included in a Particular Incorporating Indenture*, §5-7 ......................... 19

## PRELIMINARY STATEMENT

Plaintiffs Alyece Cummings and Daniel Lapka ("**Plaintiffs**") are the beneficial holders of unsecured 6.875% senior notes due 2020 and 6.125% senior unsecured notes due 2021, respectively (the "**Class Notes**") issued by Chesapeake Energy Corp. ("**Chesapeake**"). Chesapeake violated the Trust Indenture Act of 1939, 15 U.S.C. §77aaa, et seq. ("**TIA**") and the indentures governing the Class Notes when it conducted a debt restructure and offered only a select group of its existing Class Notes holders the opportunity to exchange and replace existing unsecured notes with newly issued 8.00% Second Lien Secured Notes due 2022 (the "**2L Notes**"). This December 31, 2015 exchange offer ("**Exchange Offer**") benefited large institutions who qualified under U.S. securities laws as Qualified Institutional Buyers, or "QIBs," and penalized smaller investors like Plaintiffs and other non-QIBs. Because Plaintiffs were not offered the opportunity to participate in the Exchange Offer and trade their existing unsecured debt for secured debt, Plaintiffs and other non-QIBs were left with unsecured notes (*i.e.*, notes subordinate to the 2L Notes) that had a diminished value and diminished trading market.

At the time of the Exchange Offer and continuing today, Chesapeake has experienced financial distress. The Exchange Offer adversely affected the Class Notes because the holders of the new 2L Notes have valuable and superior contractual and practical rights over the Class Notes with respect to payment following the Exchange Offer. The Exchange Offer was an impermissible out-of-court debt restructuring that has impaired or affected Plaintiffs' ability to recover principal and interest and to institute suit in pursuit thereof, in violation of the TIA and the terms of the governing indentures. In the Exchange Offer, Chesapeake also breached a lien covenant in the indentures.

Plaintiffs' detailed allegations satisfy Fed. R. Civ. P. 8 and put Defendants on notice of the claims asserted against them and the basis for the relief sought. Nothing more is required. The various arguments and contentions advanced by Defendants in their motion do not support dismissal.

First, courts have rejected Defendants' "no-action clause" defense where, as here, Plaintiffs seek to enforce a right to payment of principal and interest. *See MeehanCombs Global Credit Opportunities Funds, LP v. Caesars Entm't Corp.*, 80 F. Supp. 3d 507, 517 (S.D.N.Y. 2015) (no-action clause did not bar state law claims seeking to enforce right to payment of principal and interest). The nature of Plaintiffs' claims excuses compliance with the no-action clause. *See Whitebox Convertible Arbitrage Partners, L.P. v. World Airways, Inc.*, No. 04-cv-1350, 2006 WL 358270, at *3-4 (N.D. Ga. Feb. 15, 2006) (applying New York law, excusing compliance with no-action clause in suit asserting contract and good faith and fair dealing claims against issuer who treated bond holders "significantly differently," noting, "[e]nforcing the no-action clause in the instant case would not serve the purposes for which it was placed in the indenture").

Second, Defendants attempt to obfuscate the pleading requirements by asserting that Plaintiffs have not suffered an injury and lack standing. The Complaint, however, is replete with allegations that Plaintiffs' ability to recover payment of principal and interest, and to institute suits in pursuit thereof, has been affected or impaired because Chesapeake's financial troubles have affected its ability to repay the Class Notes. ¶¶2, 82-87.[1] The Complaint plainly states the harmful result of the Exchange Offer – the Class Notes are now effectively subordinate to the 2L Notes. ¶¶6, 189, 197, 239, 244. The Complaint alleges that since the 2L Notes have primed[2] the Class Notes with respect to the assets pledged as security for the 2L Notes, and to the assets of the guarantors, the Class Notes have diminished in value. ¶¶10, 107, 189, 239. These allegations are sufficient to demonstrate clear injury. *See, e.g., Okla. Police Pension and Ret. Sys. v. U.S. Bank Nat'l Ass'n*, 291 F.R.D. 47, 71 (S.D.N.Y. 2013), rev'd, in part, on other grounds, 775 F.3d 154

---

[1] Citations to "¶ _" refer to Plaintiffs' Amended Class Action Complaint. ECF 45.

[2] "Primed" is defined by Investopedia as "[t]he act of granting a new lender a higher claims priority over a current secured debt holder. A lender is considered primed when they are surpassed on the priority ladder for a borrower's assets." http://www.investopedia.com/terms/p/primed.asp.

(2d Cir. 2014) (plaintiff's allegations that breaches of the agreement caused mortgage loans to diminish in value, which resulted in damages to plaintiff, "raise issues of fact that cannot be resolved on a motion to dismiss").

Third, several courts have recently denied motions to dismiss similar TIA Section 316(b) claims where a corporation favors one group over another in debt restructuring efforts even absent any default event. *See, e.g., Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 613 (S.D.N.Y. 2014); *MeehanCombs*, 80 F. Supp. 3d at 515. Defendants wholly ignore the prevailing TIA case law that supports Plaintiffs' claims and, instead, rely on court opinions that do not address the scope of protections under the TIA and rely on self-serving law review articles that criticize the class action mechanism – which is specifically permitted under the Federal Rules of Civil Procedure – in an obvious attempt to persuade the Court to think poorly of Plaintiffs, their counsel and class actions in general.

Fourth, Defendants contend that Plaintiffs' breach of contract claim under Section 4.09 of the Indentures (defined below) must fail because the liens it incurred that secured the debt issued in the Exchange Offer were permitted under the terms of the Indentures. Chesapeake seems to concede that the Exchange Offer was impermissible under one of two exceptions that permitted it to incur additional debt under the Indentures, and it submits no evidence or sworn statement that the Company fell within the other exception – and it is the only party who would have the Company's non-public financial information to confirm that fact. Plaintiffs allege that the Indentures restricted the rights of Defendants to incur liens unless either the Class Notes become secured by equal and ratable liens or the liens are "Permitted Liens," as defined in the Indentures, and the former did not happen, which resulted in a breach of contract. ¶¶9, 202-228. Plaintiffs' allegations demonstrate that Plaintiffs were not only deprived of the benefit of their bargain when Chesapeake failed to treat all holders of the Class Notes equally irrespective of whether such holders

were QIBs or non-QIBs, but also that Defendants breached the Indenture by consummating the Exchange Offer.

Finally, Defendants assert that Plaintiffs' breach of contract, unjust enrichment and declaratory judgment claims lack substantive merit. But the Court is not to weigh the merits of Plaintiffs claims at the pleading stage, and numerous courts have upheld these very claims, along with TIA Section 316(b) claims, at the at the pleadings stage. *See, e.g., MeehanCombs*, 80 F. Supp. 3d at 520 (upholding breach of contract claim and TIA claim). These properly pled claims stand on their own, and may also be pleaded in the alternative.

## OVERVIEW OF RELEVANT FACTS AND PROVISIONS OF THE CLASS NOTES INDENTURES AND THE TRUST INDENTURE ACT

This is a class action brought by Plaintiffs, individually and on behalf of all persons who beneficially held Chesapeake's 6.875% Notes and 6.125% Notes from December 31, 2015 to the present. ¶1. The Class Notes are, and were at all relevant times, registered securities under the Securities Act of 1933. *Id*. The Class Notes are senior unsecured obligations of Chesapeake that rank equally in right of payment with all of the Defendants' existing and future senior unsecured debt, and which are unconditionally guaranteed by the Guarantor Defendants. ¶¶1, 6.

Like many energy companies, Chesapeake has faced severe challenges from falling oil and gas prices, threatening Chesapeake's ability to repay its debt obligations. ¶¶2, 82. Chesapeake reduced its total capital expenditures by approximately 46% from 2014 to 2015 in response to the falling commodity environment. ¶82. In response to commodity prices, Chesapeake reduced its total capital expenditures by approximately 46% from 2014 to 2015. ¶82. The company reduced its workforce by 15% to "reduce costs and better align our workforce with the needs of our business and current oil and natural gas commodity prices." *Id*. After eliminating quarterly dividend payments on its common stock in the third quarter of 2015, Chesapeake suspended dividend payments on its convertible preferred stock in the first quarter of 2016. *Id*. In its most recent annual report, Chesapeake stated

that "may not be able to fund budgeted capital expenditures or meet debt service requirements in 2017 and beyond." *Id.*

Chesapeake attempted to alleviate its debt crisis when, on December 2, 2015, it announced the Exchange Offer. ¶¶2, 105. But Chesapeake did not offer the opportunity to exchange to all holders of the Class Notes. ¶¶3, 105, 106, 146. Rather, it only offered the deal to QIBs, as defined in Rule 144 of the Securities Act. *Id.* The 2L Notes were exempt from registration under the Securities Act (Rule 144A and Regulation S), even though the Class Notes were registered securities. ¶¶3, 103, 232. QIBs were solicited to participate in the Exchange Offer and provided with a private offering memorandum that disclosed Chesapeake's views on the risks to the Class Notes if QIBs did not agree to the Exchange Offer. ¶¶54, 108. For example, Chesapeake disclosed to QIBs that:

> ### The liquidity of the Class Notes that are not exchanged will be reduced.
>
> Chesapeake Energy Corporation (the "**Company**" or "**we**") has outstanding (i) 6.250% euro-denominated senior notes due 2017, (ii) 6.50% senior notes due 2017, (iii) 7.25% senior notes due 2018, (iv) floating rate senior notes due 2019, (v) 6.625% senior notes due 2020, (vi) 6.875% senior notes due 2020, (vii) 6.125% senior notes due 2021, (viii) 5.375% senior notes due 2021, (ix) 4.875% senior notes due 2022 and (x) 5.75% senior notes due 2022 (collectively, the "**Old Notes**"). The current trading market for the Old Notes is limited. Upon consummation of the separate offers (the "**Exchange Offers**") to holders of Old Notes (1) in the United States, who are "qualified institutional buyers" … the trading market for unexchanged Old Notes will become even more limited and could cease to exist due to the reduction in the amount of such Old Notes outstanding. A more limited trading market might adversely affect the liquidity, market price and price volatility of these securities. If a market for unexchanged Old Notes exists or develops, these securities may trade at a discount to the price at which the securities would trade if the amount outstanding were not reduced, depending on prevailing interest rates, the market for similar securities and other factors. However, there can be no assurance that an active market in the unexchanged Old Notes will exist, develop or be maintained or as to the prices at which the unexchanged Old Notes may be traded.

*If we consummate the Exchange Offers, existing ratings for our senior notes remaining outstanding following completion of the Exchange Offers may not be maintained.*

¶108. While additional information concerning the risks of the Exchange Offer on the Class Notes was provided to QIBs, Defendants did not disclose those additional, material risks to Plaintiffs and other non-QIBs. *Id*.

The Exchange Offer created two classes of holders of Class Notes with very unequal rights not based on any specific term of the Indentures. ¶4. The Exchange Offer primed the Class Notes and caused them to become effectively subordinate to the obligations evidenced by the 2L Notes, which are unconditionally and irrevocably guaranteed by the Guarantor Defendants.[3] ¶¶6, 109. The settlement date for the Exchange Offer was December 31, 2015, on which date Chesapeake issued $2.369 billion in aggregate principal amount of 2L Notes to the eligible holders who participated in the exchange offer. ¶132. Approximately $196 million aggregate principal amount of the 6.875% Notes had been validly tendered and not withdrawn; and approximately $411 million aggregate principal amount of the 6.125% Notes had been validly tendered and not withdrawn. ¶¶112, 114.

Because the 2L Notes have a second lien security interest in Defendants' property (and the Class Notes do not), Plaintiffs' practical ability to recover payment of principal and interest and to institute suit in pursuit thereof has been affected or impaired. ¶¶6, 109, 189, 197, 244. This security interest is valuable in light of Defendants' financial condition, and provides 2L Noteholders a superior position in an out-of-court restructuring or reorganization. ¶107.

The 6.125% Notes were issued pursuant to an August 2, 2010 Indenture (the "**Base Indenture**," and a February 11, 2011 Fifth Supplemental Indenture thereto (the "**Fifth Supplemental Indenture**"), while the 6.875% Notes were issued pursuant to a November 8, 2005 Indenture (the "**2005 Indenture**," and with the Base Indenture and Fifth

---

[3] The Guarantor Defendants are defined in ¶¶1, 19-80.

Supplemental Indenture, the "**Indentures**"), each by the Defendants and the Guarantor parties party thereto and BNY Mellon, as trustee. ¶1. Under the Indentures, all holders have the absolute and unconditional right to receive payment of principal and interest. Section 6.07 of the 2005 Indenture provides:

> Notwithstanding any other provision in this Indenture, ***the Holder of any Securities will have the right, which is absolute and unconditional, to receive payment of the principal of and interest*** on such Securities on the stated maturity therefor and ***to institute suit for the enforcement of any such payment***, ***and such right may not be impaired without the consent of such Holder***.

¶153 (citing 2005 Indenture, § 6.07 (emphasis added)).

> Section 6.07 of the Base Indenture provides:
> Notwithstanding any other provision of this Indenture, ***the Holder of any Securities will have the right, which is absolute and unconditional, to receive payment of the principal of and interest*** on such Securities on the Maturity therefor and ***to institute suit for the enforcement of any such payment, and such right may not be impaired without the consent of such Holder***.

¶154 (citing Base Indenture, § 6.07 (emphasis added)).

Those sections are mandated by TIA Section 316(b), which provides in pertinent part:

> ***Notwithstanding any other provision of the indenture to be qualified***, ***the right of any holder*** of any indenture security ***to receive payment of the principal of and interest on such indenture security***, on or after the respective due dates expressed in such indenture security, ***or to institute suit for the enforcement of any such payment*** on or after such respective dates, ***shall not be impaired or affected without the consent of such holder*** . . . .

15 U.S.C. § 77ppp(b) (emphasis added).

Defendants breached the Indentures by consummating the Exchange Offer. Section 4.09 of the Indentures required the Defendants to offer equal and ratable liens to all holders of Class Notes when exchanging old unsecured notes for secured notes in the Exchange Offer. ¶¶208-209. Section 4.09 promised holders of the Class Notes that if Defendants were to create, or otherwise cause to suffer to exist any lien of any kind, other than "Permitted

Liens," then the Class Notes would be secured with the same liens, on an equal and ratable basis. ¶¶209, 210, 220-221. The "New Liens" were not Permitted Liens under the Indentures, and did not fit within the limited exceptions under Section 4.09 (¶¶212-218, 222-228) nor has Chesapeake demonstrated that it complied with this section in effectuating the Exchange Offer.

It was pervasive throughout the Indentures that holders of Class Notes were not to be treated differently, whether they were QIBs or non-QIBs. ¶¶8, 158-163, 233. However, the Exchange Offer was prejudicial to Plaintiffs and other non-QIBs in violation of the covenant of good faith and fair dealing, implied in every New York contract.[4] ¶¶9, 229-236. Neither the prejudicial conduct, nor the risks that Class Notes would be subordinated to the eventual 2L Notes could have been foreseen by Plaintiffs. ¶¶7, 235. For these reasons, Defendants' deprived Plaintiffs of the benefit of their bargain. ¶¶7, 234-236.

## ARGUMENT

## I. LEGAL STANDARD

In considering a motion to dismiss, the Court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. *See Coosewoon v. Meridian Oil Co.*, 25 F.3d 920, 924 (10th Cir. 1994). A motion to dismiss should be granted only if the complaint is unable to articulate "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662 (2009). If a complaint subject to Fed. R. Civ. P. 8 contains sufficient "factual content" to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," the plaintiff has met its burden of stating a claim with "facial plausibility." *Iqbal*, 556 U.S. at 678. Upon a motion to dismiss the court should not evaluate the merits of the allegations. "A well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof . . . is

---

[4] The Indentures are governed by New York law. ¶165; Complaint Exs. A at §13.08 and K at §11.08.

improbable, and that a recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (quotation omitted).

## II.    THE NO-ACTION CLAUSE DOES NOT BAR PLAINTIFFS' CLAIMS NOR ARE PLAINTIFFS PRECLUDED FROM BRINGING SUIT ABSENT AN EVENT OF DEFAULT

Defendants cannot escape liability by relying on the "no-action" clause that does not apply to Plaintiffs' claims. Section 6.06 of the Indentures provides for certain safeguards to ensure that claims and causes of action commenced on behalf of bondholders are not duplicative, frivolous, or economically inefficient as against the issuer at the expense of the majority's interest. *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 560 (N.Y. 2014). Section 6.06 is not without limits, as a bondholders' right to receive payment of principal and interest may not be impaired or affected, and is not limited by any other contractual provision. Section 6.07 provides "***Notwithstanding any other provision of this Indenture***, the Holder of any securities will have the right, ***which is absolute and unconditional***, to receive payment of the principal of and interest on such Securities …." Indentures, §6.07(emphasis added).

Both the Indentures and TIA Section 316(b) permit Plaintiffs to institute a lawsuit to enforce their absolute and unconditional right to receive payment of principal and interest notwithstanding the no-action clause. Section 6.07 does not limit that exception to suits for unpaid principal and interest. *See MeehanCombs*, 80 F. Supp. 3d at 518; *Cont'l Cas. Co. v. State of N.Y. Mortg. Agency*, No. 94-cv-8408, 1998 WL 513054, at *4 (S.D.N.Y. Aug. 18, 1998) (action to enforce payment of principal and interest did not require compliance with no-action provisions where right to receive payment exception to no-action clause in indenture contained no express language limiting its application to suits for unpaid principal and interest); *see also Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*, No. 99-cv-10517, 1999 WL 993648, at *8 n.7 (S.D.N.Y. Nov. 2, 1999); *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. 03-cv-5808, 2008 WL 744823,

at *10 (S.D. Tex. Mar. 19, 2008) ("A significant exception to a no-action clause is the bondholder's/noteholder's individual right to sue for payment of principal and interest on or after the due dates set out in his bond/note") (citing cases).

Defendants fail to address controlling case law and Plaintiffs' well pleaded allegations that their TIA and state law claims are excused from compliance with the no-action clauses. In fact, Defendants cite no authority to support their argument that Plaintiffs' claims must be dismissed for failure to comply with Section 6.06.[5] Defendants' argument that Plaintiffs lack standing because there has been no Event of Default is a mere reiteration of their no-action clause argument, and it fails for the same reason – because this is an action related to Plaintiffs' right to payment of principal and interest and the enforcement thereof, under Section 6.07 of the Indentures, which provision reigns supreme over all other provisions and shall not be impaired or affected without unanimous consent.

Further, as a matter of equity, the Exchange Offer was announced on December 2, 2015 and consummated on December 31, 2015, well before Plaintiffs could have even complied with the 60-day requirement of the no-action clause. ¶¶178-179. While the purpose of a no-action clause is to prevent expensive lawsuits that do not have the support of at least 25% of the noteholders and that may not be in their "collective economic interest,"[6] that policy is questionable because of the nature of the conduct alleged and since Plaintiffs purport to represent a class of noteholders representing millions of dollars of

---

[5] Defendants rely on *Brady* in an effort to persuade the Court that class actions are somehow improper and non-meritorious – an obvious attempt to deflect from the current state of the law. Defts' Br. at 10. Notably, the 10th Circuit in *Brady* recognized that TIA §316(b) was enacted to prevent out of court debt restructurings from being forced on minority bondholders and to provide judicial scrutiny of debt readjustment plans to ensure their equity. *Brady v. UBS Fin. Servs., Inc.*, 538 F.3d 1319, 1325 (10th Cir. 2008)). The Court also noted that "limitations of a no-action clause apply only to suits under an indenture, [and] not to the absolute and unconditional right to sue on [a] debenture for payment when due." *Id*. at 1326.

[6] *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc*., 837 F. Supp. 2d 162, 184 (S.D.N.Y. 2011).

aggregate principal amount of Class Notes. *See MeehanCombs*, 80 F. Supp. 3d at 520.[7] In fact, in an action asserting similar TIA claims, the Court permitted litigants to pursue their claims despite the no-action clause where such litigants held only 2% of one series of bonds and 5% of another series of bonds, each significantly below the 25% threshold. *See MeehanCombs*, Case No. 14-cv-07091-JSR (S.D.N.Y.), ECF 1 (Complaint), ¶¶1, 12-16, 25. Moreover, each of the plaintiffs in *MeehanCombs* and *Danner* asserted TIA and non-TIA claims[8] that were immune from dismissal.

## III. PLAINTIFFS HAVE PROPERLY ALLEGED INJURY RESULTING FROM THE EXCHANGE OFFER

The Complaint sets forth numerous allegations of harm Plaintiffs suffered as a result of the Exchange Offer. *See, e.g.*, ¶¶2, 6, 87-89, 189, 197, 239, 244. For example, Plaintiffs allege harm "as a direct and intentional result of the Exchange Offer … [because] the Class Notes … have been subordinated to the 2L Notes with respect to assets of the Defendants to which the 2L Notes have liens, reducing the value of the Class Notes and impairing the rights of Plaintiffs and other Class members under the Indentures to receive interest and principal." ¶239. Indeed, Plaintiffs' allegations of harm have been found by courts to adequately establish injury, including: (i) that the Class Notes diminished in value as a result of the Exchange Offer, and (ii) that Plaintiffs' debt is now subordinate to the 2L Notes, which is injurious because (a) the potential for a further credit rating downgrade, and (b) Chesapeake is financially distressed more than adequately establishes injury.[9] *See*

---

[7] The *MeehanCombs* decision also involved a small retail holder, in the class action captioned *Frederick Barton Danner v. Caesars Entm't Corp., et al.* Case No. 14-cv-7973-JSR (S.D.N.Y.).

[8] *See Frederick Barton Danner v. Caesars Entm't Corp., et al.*, Case No. 14-7973-JSR (S.D.N.Y.), ECF 28 (Danner Complaint), Count IV (breach of contract); *Trilogy v. Caesars Entm't Corp., et al.*, Case No. 14-7973-JSR (S.D.N.Y.), ECF 1 (MeehanCombs Complaint), Counts V and VII (breaches of contract).

[9] While Plaintiffs do not allege an imminent bankruptcy filing (without the benefit of discovery), they have alleged Chesapeake is financially distressed, that Chesapeake

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 166 (2d Cir. 2012) (Article III injury existed where misconduct resulted in a decline in value of the security, a rating agency downgrade, and holders were exposed to increased risk as a result of the defendants' misconduct even where defendant did not file for bankruptcy); *Royal Park Invs. SA/NV v. HSBC Bank USA, N.A.*, 109 F. Supp. 3d 587, 612 (S.D.N.Y. 2015) (plaintiffs properly pleaded TIA damages, alleging diminution in value of their notes, not "actual damages," noting "[t]he method for measuring recoverable damages will be determined at a later date, as is customary in securities Actions").

These allegations are particularly sufficient to establish injury at the pleading stage. *See Okla. Police Pension and Ret. Sys.*, 291 F.R.D. at 71 (allegations that breaches of an agreement caused mortgage loans to diminish in value, which resulted in damages to plaintiff, "raise[d] issues of fact that cannot be resolved on a motion to dismiss"); *Acumen Re Mgmt. Corp. v. Gen. Sec. Nat. Ins. Co.*, No. 09-cv-01796, 2012 WL 3890128, at *11 (S.D.N.Y. Sept. 7, 2012) ("That damages are uncertain, or may not . . . exist, is an insufficient reason . . . to grant [a motion to dismiss]"); *Medinol Ltd. v. Boston Scientific Corp.*, 346 F. Supp. 2d 575, 599 (S.D.N.Y. 2004) ("Even if [plaintiff] cannot prove any damages . . . it may still maintain its claim for breach of contract").

In *NECA-IBEW Health & Welfare Fund*, the court held the plaintiff alleged an injury in a Section 11 of the Securities Act case based on allegations that defendants' misconduct resulted in a "decline in value" of the security (mortgage-backed certificate), and that rating agencies "put negative watch labels on the Certificate[s] …. [A]nd downgraded previously assigned ratings" and that holders were exposed to increased risk

---

reduced its total capital expenditures by 46% in response to falling commodity prices, instituted a 15% workforce reduction for the same reason, eliminated quarterly cash dividends on its common stock effective third quarter of 2015, and suspended dividend payments on its convertible preferred stock in the first quarter of 2016. ¶82. In addition, Chesapeake stated in its most recent annual report that it "may not be able to fund budgeted capital expenditures or meet [our] debt service requirements in 2017 and beyond," and has the potential for a further credit rating downgrade. ¶¶82-87.

as a result of the defendants' misconduct. 693 F.3d at 166. The defendants in *NECA-IBEW* argued that plaintiff suffered no loss where there were no missed payments. *Id*. at 166. The court disagreed, noting a fixed income investor need not have "miss[ed] an interest payment before his securities can be said to have declined in 'value.'" *Id*. The Court also noted that a heightened credit risk may suffice to establish injury. *Id*. at 167. Plaintiffs alleged similar allegations of injury in this case (¶¶82-87, 239), and thus have standing. *See Policeman's Annuity & Benefit Fund of City of Chi. v. Bank of Am., NA*, 907 F. Supp. 2d 536, 546 (S.D.N.Y. 2012) (plaintiff "plausibly alleged Article III standing: (a) a diminution in value of the certificates it purchased (b) as a result of defendants' purported breaches of the [contract] that is (c) redressable through this breach of contract action as well as under various provisions of the [TIA]") (citations omitted).

Because the Complaint sets forth numerous allegations demonstrating injury resulting from subordination and a decline in value and market liquidity, Defendants' argument that Plaintiffs have not established injury because the trading price of the notes has gone up since the Exchange Offer (which Defendants again do not support with any legal authority) is unavailing. It is also undermined by how the credit agencies view Chesapeake and the Class Notes, who have lowered their credit ratings of the Class Notes since the Exchange Offer, as follows:

**CHK.HH (Chesapeake Energy 6.875% notes due 2020)**

| Moodys | | S&P | | Fitch | |
|---|---|---|---|---|---|
| Date | Bond Ratings | Date | Bond Ratings | Date | Bond Ratings |
| 2/22/2016 | Caa3 | 9/19/2016 | D | 2/25/2016 | B-u |
| 1/21/2016 | B3 | 2/9/2016 | CC | 12/16/2015 | B |
| 12/4/2015 | B3 | 1/25/2016 | CCC- | 12/4/2015 | BB- |
| 10/5/2015 | Ba3 | 12/22/2015 | CCC+ | 11/6/2015 | BB- |
| | | 12/4/2015 | BB- | | |
| | | 10/2/2015 | BB- | | |

**CHK.AA (Chesapeake Energy 6.125% notes due 2021)**

| Moodys | | S&P | | Fitch | |
|---|---|---|---|---|---|
| Date | Bond Ratings | Date | Bond Ratings | Date | Bond Ratings |
| 2/22/2016 | Caa3 | 6/9/2016 | D | 2/25/2016 | B-u |
| 1/21/2016 | B3 | 2/9/2016 | CC | 12/16/2015 | B |
| 12/4/2015 | B3 | 1/25/2016 | CCC- | 12/4/2015 | BB- |
| 10/5/2015 | Ba3 | 12/22/2015 | CCC+ | 11/6/2015 | BB- |
| | | 12/4/2015 | BB- | | |
| | | 10/2/2015 | BB- | | |

*See* www.bloomberg.com.

Plaintiffs allege a violation of a contractual right and that the practical status of the bonds changed or that their bonds diminished in value.[10] These types of allegations establish an injury-in-fact at the pleading stage. *See Okla. Police Pension and Ret. Sys.*, 291 F.R.D. at 71 (allegations that breaches of the agreement caused mortgage loans to diminish in value, which resulted in damages to plaintiff, "raise issues of fact that cannot be resolved on a motion to dismiss").

Defendants acknowledged the harm the Exchange Offer would cause to the Class Notes, disclosing that the Exchange Offer would negatively impact the liquidity, marketability and market price of the Class Notes. Defendants' position discredits and contradicts prior disclosures to investors. ¶108. Defendants even acknowledge this specific harm in their public filings:

> the trading market for unexchanged [Class] Notes will become even more limited and could cease to exist due to the reduction in the amount of such [Class] Notes outstanding. A more limited trading market might adversely affect the liquidity, market price and price volatility of these securities. If a market for unexchanged [Class] Notes exists or develops, these securities may trade at a discount to the price at which the securities would trade if the amount outstanding were not reduced, depending on prevailing interest rates, the market for similar securities and other factors.

¶108.

## IV.  DEFENDANTS VIOLATED TIA SECTION 316(B) AND SECTION 6.07 OF THE INDENTURES[11]

---

[10] Going beyond facts in the Complaint, Defendants cite trading prices of the Class Notes, arguing that the Exchange offer benefitted Plaintiffs. Defendants' argument, if relevant, is a based on issues of fact, untested and without appropriate discovery.

[11] Because Section 6.07 is required by TIA Section 316(b), Plaintiffs address both the statutory and contract claims simultaneously. *See Bluebird Partners, L.P. v. First Fid. Bank, N.A.*, 85 F.3d 970, 974 (2d Cir. 1996) ("[t]he interpretation of the indenture provisions mandated by the [Trust Indenture] Act does not depend on ordinary contract principles - the intent of the parties - but depends on an interpretation of the [statue]").

The TIA imposes certain mandatory terms on qualified indentures to protect investors. One mandatory term precludes issuers from impairing or affecting non-consenting noteholders' right to receive principal and interest on their notes or to institute suit for the enforcement thereof. TIA Section 316(b) protects each and every holder's absolute and unconditional right to receive payment of the "principal of . . . and . . . interest on such Security" and "and to institute suit for the enforcement of any such payment, and such rights shall not be impaired or affected without the consent of such Holder." 15 U.S.C. § 77ppp(b). Section 6.07 of the Indentures incorporate this protection.

### A. The TIA Was Implemented to Protect Holders' Unconditional Rights to Receive Payment of Principal and Interest

The TIA was "designed to vindicate a federal policy of protecting investors." *BOKF, N.A. v. Caesars Entm't Corp.*, 144 F.Supp.3d 459, 465 (S.D.N.Y.) (quotation marks omitted) (quoting *Bluebird Partners*, 85 F.3d at 974). TIA Section 316(b) "was designed to provide judicial scrutiny of debt readjustment plans to ensure their equity." *MeehanCombs*, 80 F. Supp. 3d at 513 (citing *Brady v. UBS Fin. Servs., Inc.*, 538 F.3d 1319, 1325 (10th Cir. 2008)). "As a result of section 316(b), a company cannot – outside of bankruptcy – alter its obligation to pay bonds without the consent of each bondholder." *Id.*

### B. The TIA Protects Holders' Payment Rights that Have Been Impaired or Affected by an Issuer's Out-of-Court Debt Restructuring Activities

TIA Section 316(b) "is designed to prevent" an "impermissible out-of-court debt restructuring achieved through collective action." *MeehanCombs*, 80 F. Supp. 3d at 516; *see also BOKF*, 144 F. Supp. 3d at 467. Thus, TIA Section 316(b) protects *more* than the noteholders' legal right to sue, it also protects noteholders' "practical ability" to recover payments as they become due. *See Marblegate*, 75 F. Supp. at 613; *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 111 F. Supp. 3d 542, 555 (S.D.N.Y. 2015) ("*Marblegate II*"); *MeehanCombs*, 80 F. Supp. 3d at 515; *BOKF*, 144 F. Supp. 3d at 467; *Federated*,

1999 WL 993648, at *7. Whether a bondholder's rights have been impaired or affected is measured as of the date payment is due under the indenture. *BOKF*, 144 F. Supp. 3d at 474. An action that is part of a restructuring that has the effect of impairing the practical ability to recover at a later maturity date violates TIA Section 316(b) regardless of the issuer's financial condition at the time of the action. *Id.* at 474-475. These cases undoubtedly represent the courts' prevailing view of the scope of protections afforded by the TIA.

Defendants rely solely on *Brady* to support their position that TIA Section 316(b) protects only the legal right, and not the practical ability, to recover payment when payment is due. But *Brady* largely concerned whether the statute of limitations had run on the plaintiffs' suit to recover principal and interest on the date of the maturity date of the bonds. *See Brady*, 538 F.3d at 1321. The Court found the statute of limitations had in fact run when the plaintiff commenced suit on the maturity date of the bonds because the bonds were declared due and payable years earlier, as there had been an Event of Default under the indenture and more than 25% of the outstanding bondholders exercised the acceleration clause. *Id.* at 1324. *Brady* did not address the scope of protection of the right to receive payment. Defendants claim that the Tenth Circuit "has noted" that TIA Section 316(b) protects a holders legal right, and not to the holder's practical rights to the payment. Defts' Br. at 17. Defendants cherry pick this concept from a footnote in *Brady* where the court, in dicta, citing a Delaware bankruptcy court opinion, surmised "[a]rguably, the right to bring suit under [the indenture provision mandated by TIA §316(b)] is not absolute. Had [the] court entered a judgment on the amounts due under the bonds, the outcome . . . might be different." *Brady*, 538 F.3d at 1326, n.9 (*citing Magten Asset Mgmt. Corp. & Law Debenture Trust Co. v. Nw. Corp.* ("*Northwestern*"), 313 B.R. 595, 600 (Bankr. D. Del. 2004)).

Rather than addressing the wealth of case law directly addressing the scope and breadth of TIA Section 316(b) in the New York district courts, Defendants rely on *Northwestern*. *Northwestern* dealt with a challenge to a transaction whereby the issuer's

assets were transferred to an insolvent corporation that assumed the liabilities under the indenture. *Northwestern*, 313 B.R. at 595. The *Northwestern* court reached its holding without addressing *Federated* (existing SDNY precedent), and Defendants do not explain why the facts in the instant action more resemble *Northwestern* rather than *MeehanCombs*, *BOKF*, *Marblegate I, Marblegate II* or *Federated*.[12]

## C. Plaintiffs Have Properly Pleaded a TIA Claim

The applicable case law demonstrates that Plaintiffs have properly alleged a TIA violation. For more than 15 years, courts have reached the same conclusion as to the scope of TIA Section 316(b) – that the protection is broad and protects a bondholder's practical ability, not just legal right, to recover payments due under an indenture. *See BOKF*, 144 F. Supp. 3d at 467, *MeehanCombs*, 80 F. Supp. 3d at 516; *Marblegate II*, 111 F. Supp. 3d at 555; *Federated,* 1999 WL 993648, at *7.

Plaintiffs allege that the Class Notes are TIA qualified debt securities (¶187), that the Exchange Offer has impaired or affected Plaintiffs' ability to receive payment on the Class Notes because (i) the Class Notes are now subordinated to 2L Notes with respect to Defendants' assets, and (ii) Chesapeake has faced severe challenges from recent declines in commodity prices and has experienced downgrades from rating agencies. ¶¶2, 6, 82-87, 189, 197, 239, 244. Defendants did not have Plaintiffs' consent to conduct the Exchange Offer. ¶¶190, 198, 244. For these reasons, Plaintiffs' right to receive payment has been affected or impaired in violation of TIA Section 316(b). *See, e.g., BOKF*, 144 F. Supp. 3d

---

[12] Defendants state that TIA Section 316(b) "does not come into play" unless there is a near-bankruptcy restructuring, citing *YRC Worldwide, Inc. v. Deutsche Bank Trust Co. Americas*, No. 10-2106, 2010 WL 2680336 (D. Kansas, July 1, 2010). *YRC Worldwide* is also distinguishable, where the trustee alleged amendments to the indenture, which deleted the merger and "substantially all" covenants, violated TIA Section 316(b). 2010 WL 2680336, at *6-7 (court determined the amendments would not "necessarily leave the holders with no practical ability to receive payments due under the notes" because "the trustee ha[d] not shown [the company was] in fact divesting itself of . . . assets" such that the amendment would affect the holders' ability to recover.).

at 467, *MeehanCombs*, 80 F. Supp. 3d at 516; *Marblegate*, 111 F. Supp. 3d at 555; *Federated,* 1999 WL 993648, at *7.

*Oaktree Capital Mgmt., LLC v. Spectrasite Holdings, Inc.*, No. 02-cv-548 (JJF), 2002 WL 32173072 (D. Del. June 25, 2002) is instructive. In *Oaktree*, plaintiffs, who were beneficial holders of notes, sought to temporarily restrain implementation of a tender offer that would result in the transfer of substantially all of Spectrasite's assets to another entity and render the plaintiffs' notes subordinate to newly issued debt. *Id.* at *4. The plaintiffs alleged that the tender offer impaired and affected their rights to receive payments on their notes, violating TIA Section 316(b) and the indentures. *Id.* Spectrasite argued the TIA claim was not meritorious because the tender offer would purportedly strengthen its long-term prospects, permitting it to pay principal and interest when due, and that Spectrasite had the right to incur the senior debt. *Id.* While *Oaktree* ultimately denied the preliminary injunction motion, it held that plaintiffs had a reasonable probability of success on the merits on their TIA claim, noting that it could not address Spectrasite's solvency at that time, and concluding that incurrence of senior debt could impair the *Oaktree* plaintiffs' right to receive payment on their notes, particularly in the event of a future bankruptcy filing. *Id.* Similarly, here, the issuer can be liable under the TIA even if there is no bankruptcy. *MeehanCombs*, 80 F. Supp. 3d at 515. It is enough that Plaintiffs allege Chesapeake is financially distressed, the priority treatment of the 2L Notes and out of court restructuring activities,[13] will impair or affect Plaintiffs' rights on the Class Notes. ¶¶6, 189, 197, 239, 244. *MeehanCombs*, 80 F. Supp. 3d at 515.

---

[13] Whether Chesapeake was undergoing an out of court debt restructuring, as opposed to a routine business transaction, is an issue of fact and is not appropriate for dismissal at this stage of the litigation. *See BOKF*, 144 F. Supp. 3d at 475 ("summary judgment is inappropriate at this stage where, as here, there is a genuine dispute as to whether the challenged transactions, either individually or collectively, were an out-of-court reorganization and the record has not been fully developed").

Defendants (citing no case law) assert that Plaintiffs cannot allege TIA Section 316(b) violations as a means of undermining the Indentures' terms and the no-action clause. Defts' Br. at 19-20. Plaintiffs specifically promote upholding the covenants and agreements set forth in the Indentures: Defendants cannot ignore that Section 6.07 provides "*Notwithstanding any other provision of this Indenture*, the Holder of any Securities will have the right, which is *absolute and unconditional*, to receive payment of the principal of and interest," and Defendants should give effect to this provision above any and all other provisions in the Indentures. Indeed, the Tenth Circuit in *Brady* specifically referred to this very concept. *Brady*, 538 F.3d at 1326 (the no-action clause does not apply to suits relating to the absolute and unconditional right to sue on the debenture for payment when due) (citing *Commentaries on the Model Debenture Indenture Provisions 1965 Model Debenture Indenture Provisions All registered Issues 1967 and Certain Negotiable Provisions Which May Be Included in a Particular Incorporating Indenture*, §5-7 at 233). Plaintiffs do not assert that Chesapeake is not "free to operate its business in the manner that senior management and the board of directors" sees fit (this is not a derivative action, to be clear), but Plaintiffs do allege that Chesapeake is *not* permitted to operate its business in a manner that breaches the terms of the Indentures and violates TIA Section 316(b).

## V. DEFENDANTS BREACHED SECTION 4.09 OF THE INDENTURES BY CONSUMMATING THE EXCHANGE OFFER

To state a breach of contract claim under New York law, a plaintiff must allege: (1) a valid contract; (2) plaintiff's performance; (3) defendant's failure to perform; and (4) damages resulting from the breach. *Legum v. Russo,* 133 A.D.3d 638, 639 (N.Y. App. Div. 2d Dep't 2015). The Complaint adequately alleges each of these elements.

Defendants wrongly assert they were permitted to exclude Plaintiffs and other non-QIBs from the Exchange Offer under certain circumstances, and that Plaintiffs have failed to plausibly allege that the Exchange Offer was not permitted under each of these provisions [permitted exceptions]. Defts' Br. at 21. Plaintiffs allege that the "new liens"

given to secure the 2L notes were not "Permitted Liens" under the Indentures because: (1) it did not result in liens securing indebtedness under Credit Facilities (¶¶213, 214, 216); (2) the 2L Notes were not issued pursuant to the Base Indenture (¶215) because the unsecured notes exchanged in the Exchange Offer were unsecured without collateral, the Exchange Offer was not permitted under the 2005 Indenture because subsection (iv) of the definition of "Permitted Liens" does not permit the creation of the new lien. ¶226. The Exchange Offer also did not fall within the exceptions in Section 4.09 that permitted Chesapeake to incur additional debt when the amount of the debt incurred is less than 15% of the Adjusted Consolidated Net Tangible Assets ("**ACNTA**" test). Since Chesapeake did not disclose if the amount of debt incurred in the Exchange Offer exceeds 15% of Chesapeake's ACNTA, determined on the date of incurrence or issuance, the Exchange Offer did not fall within the exception set forth in section 4.09. ¶218. For these reasons, the liens incurred in the Exchange Offer were not "Permitted Liens."

Defendants argue the section 4.09 breach claim fails because the Complaint "does not plead that Chesapeake violated the ACNTA test." Defts' Br. at 21. But Plaintiffs allege Chesapeake "has not disclosed that it meets this ACNTA test [which is determined by non-public financial information] and thus the New Liens securing the 2L Notes do not qualify as an exception to Permitted Liens." ¶¶218, 228. Chesapeake argues it was not required to disclose it complied with the ACNTA test, a calculation based on non-public financial information, unavailable to holders of Class Notes. And, Defendants wrongly claim the Complaint fails to plead what the ACNTA test is. ¶171. Moreover, Defendants obfuscate their financial health, stating, without evidence or a sworn statement, that they "did, of course, comply with the ACNTA test." Defts' Br. at 22. Thus, for purposes of Rule 8, Plaintiffs have alleged the liens securing the 2L Notes were not Permitted Liens, in violation of Sections 4.09 of the Indentures. At the pleading stage, Plaintiffs are not required to allege anything more. *See Fixed Income Shares: Series M v. Citibank N.A.*, 130 F. Supp. 3d 842, 853 (S.D.N.Y. 2015) ("[A]s several courts have recognized, '[a]t the

pleading stage, plaintiffs cannot be required to identify breaches of representations and warranties with respect to the individual loans in the specific trusts [as] such information, at this stage, is uniquely in the possession of defendants.'") (quoting *Policemen's Annuity & Ben. Fund of City of Chi. v. Bank of Am., NA*, 943 F. Supp. 2d 428, 442 (S.D.N.Y. 2013) *abrogated by Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154 (2d Cir. 2014).

Furthermore, Defendants' argument that the Exchange Offer was permitted has been rejected under New York law in similar circumstances. *See Bank of N.Y. Mellon v. Realogy Corp.*, 979 A.2d 1113, 1128 (Del. Ch. 2008) (finding QIBs-only exchange offer was impermissible and in violation of indenture terms because additional indebtedness was not a permitted lien).

## VI. THE COMPLAINT STATES A CLAIM FOR VIOLATION OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

The duty of good faith and fair dealing is "[i]mplicit in all contracts … in the course of contract performance," and "embraces a pledge that 'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." *Dalton v. Educ. Testing Serv.*, 87 N.Y.2d 384, 389 (1995). A party breaches that duty when it acts in a manner that deprives the other party of the benefit of its bargain, regardless of any technical breach of contract. *See Chase Manhattan Bank, N.A. v. Keystone Distribs.*, 873 F. Supp. 808, 816 (S.D.N.Y. 1994).

Numerous Indenture provisions make clear that holders of the Class Notes were to be treated equally irrespective of whether they were QIBs or non-QIBs. ¶¶7, 232-233. The Exchange Offer – which resulted in the Class Notes being subordinate to the very notes that were once part of the same debt issuance – deprived Plaintiffs of the benefit of their bargain under the Indentures, including the ultimate benefit – the right to receive payment on the Class Notes. ¶234. The Class Notes offering prospectus did not disclose the risk of the Exchange Offer, or that a large portion of the Class Notes could one day be subordinate

to a portion of the very same notes issued in the original offering, nor could Plaintiffs have foreseen that risk at the time they purchased their Class Notes. ¶¶7, 235. These allegations state a breach of the covenant of good faith and fair dealing. *See MeehanCombs*, 80 F. Supp. 3d at 520 (good faith and fair dealing claim upheld where defendants impaired plaintiffs' right to payment under notes without plaintiffs' consent); *Chase Manhattan Bank*, 873 F. Supp. at 816 (good faith and fair dealing claim upheld where plaintiff alleged defendant manipulated funds' sales to dry up income stream defendant was obligated to pay plaintiff and took steps to keep income for itself).

Despite Plaintiffs' well pleaded allegations that Defendants violated sections 4.09 and 6.07 in effectuating the Exchange Offer Count II and III), Defendants assert that nothing prevented them from undertaking the Exchange Offer (Defts' Br. at 23). But, Plaintiffs allege that the Indentures expressly prohibited Chesapeake from incurring liens to secure the 2L Notes without giving equal and ratable liens to the Class Notes. Thus, Plaintiffs properly allege that the Exchange Offer violated the express terms (and limitations) of Section 4.09 because the incurred liens securing the 2L Notes were not incurred on an equal or ratable basis to the Class Notes. ¶¶210, 218, 220, 221.

Defendants argue that the implied covenant claim fails because the Exchange Offer did not prevent performance under the Indentures. But Plaintiffs specifically allege that the Exchange Offer substantially increased the risk that Plaintiffs will be deprived of the ultimate benefit of the right to receive payment of principal and interest. ¶234. In the very good chance that Chesapeake finds itself in a bankruptcy proceeding, Plaintiffs' claims will be subordinate to the 2L lenders. This was not the case the day prior to the Exchange Offer. Plaintiffs have thus been harmed. ¶236.[14] Moreover, a "claim for breach of contract does

---

[14] Defendants misunderstand Plaintiffs' reference to numerous Indentures provisions that demonstrate Chesapeake's intent to treat bondholders equally. ¶¶8, 58-61. These provisions indicate Chesapeake intended to treat all bondholders *pari passu* – Plaintiffs do not allege that these provisions have been directly breached or called into question.

not preclude a party from bringing a claim for breach of the implied covenant of good faith and fair dealing when they are brought in the alternative." *Fantozzi v. Axsys Techs., Inc.,* No. 07–CV–2667(LMM), 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008).

## VII.  THE COMPLAINT STATES A CLAIM FOR UNJUST ENRICHMENT

To state an unjust enrichment claim, a plaintiff must allege: "1) that the defendant benefitted; 2) at the plaintiff's expense; and 3) that equity and good conscience require restitution." *Delaware Cty. v. Leatherstocking Healthcare, LLC,* 110 A.D.3d 1211, 1213 (N.Y. App. Div. 2d Dep't 2013). Plaintiffs allege that the Exchange Offer allowed Defendants to eliminate hundreds of millions of dollars of debt incurred under the Indentures and, thus, Defendants were enriched by the transaction. ¶¶10, 238-240. Plaintiffs further allege that, as a direct and intentional result of the Exchange Offer, the Class Notes held by Plaintiffs were subordinated to the 2L Notes, which reduced the value of the Class Notes and impaired Plaintiffs' rights to receive interest and principal. ¶¶6, 10, 189, 239.

Defendants seek dismissal of the unjust enrichment claim as duplicative of the breach of contract claim. Defs' Br. at 24. However, a plaintiff may plead unjust enrichment in the alternative to breach of contract. *Goldman v. Simon Prop. Grp., Inc*., 58 A.D.3d 208, 220 (N.Y. App. Div. 2d Dep't 2008) (permitted pleading unjust enrichment as alternative to breach of contract claim).

## VIII.  THE COMPLAINT STATES A DECLARATORY JUDGMENT CLAIM

The Declaratory Judgment Act states that "[i]n a case of an "actual controversy" within its jurisdiction, a federal court "may declare the rights and other legal relations of any interested party seeking such [a] declaration…." 28 U.S.C. § 2201(a). An "actual controversy" is "'real and substantial ... admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.'" *E.R. Squibb & Sons, Inc. v. Lloyd's & Cos.,* 241 F.3d

154, 177 (2d Cir. 2001) (quotations omitted). In considering an action for declaratory judgment, a court must ask: (1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty. *Kramer v. Lockwood Pension Servs.,* 653 F. Supp. 2d 354, 375–76 (S.D.N.Y. 2009) (citation omitted).

Plaintiffs seek a declaration regarding the validity and enforceability of the Exchange Offer and the 2L Notes. ¶¶241-249. A declaration of rights under the Indentures is necessary and appropriate to establish that the Exchange Offer is ineffective and that the liens purportedly created in the Exchange Offer for the benefit of the 2L Notes are null and void. *Id.* Plaintiffs seeks a declaration of their, and other bondholders', rights under a contract (the Indentures), making this an "appropriate circumstance for declaratory judgment." *Penn. Mut. Life Ins. Co. v. Wolk*, 739 F. Supp. 2d 387, 394 (S.D.N.Y. 2010) (finding declaratory judgment claims proper, including declaration of rights under an insurance contract).

Defendants do not claim that the declaratory judgment claim against Chesapeake is not properly pleaded. Instead, Defendants assert that there has not been an Event of Default, so Chesapeake cannot be sued, which is merely a reiteration of Defendants' argument that Plaintiffs' claims must be dismissed for failure to comply with the no-action clause. For the same reasons set forth above, that argument must be rejected.

Defendants further argue (again citing no legal authority) that the declaratory judgment claims against the guarantors fails, because Plaintiffs do not "allege how or why the guarantors could possibly be liable." Defendants' argument is belied by the express allegations set forth in the Complaint. ¶¶248-249. The Guarantor Defendants' liability stems from the Indentures – they were parties to the relevant Indentures and guaranteed the payment of principal and interest thereunder. ¶¶1, 19-80, 248-249.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety.[15]

Dated: November 18, 2016

Respectfully submitted,

**FEDERMAN & SHERWOOD**

By: */s/* Joshua D. Wells
William B. Federman, OBA # 2853
Joshua D. Wells, OBA # 22334
10205 N. Pennsylvania Avenue
Oklahoma City, OK 73120
Tel: 405-235-1560
Fax: 405-239-2112
wbf@federmanlaw.com
jdw@federmanlaw.com

**GARDY & NOTIS, LLP**
James S. Notis
Meagan Farmer
Tower 56
126 East 56th Street, 8th Floor
New York, New York 10022
Tel: 212-905-0509
Fax: 212-905-0508

**GRANT & EISENHOFER P.A.**
Jay W. Eisenhofer
Gordon Z. Novod
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501

*Attorneys for Plaintiffs*

---

[15] If the Court determines Plaintiffs have not properly pleaded any or all of their claims, Plaintiffs respectfully request the right to replead such claims. *See* Fed. R. Civ. P. 15(a)(2) (leave to amend is "freely granted").

**CERTIFICATE OF SERVICE**

I hereby certify that on November 18, 2016, I electronically filed the foregoing document with the United States District Court for the Western District of Oklahoma by using the CM/ECF system. I certify that the following counsel are registered as ECF Filers and that they will be served by the CM/ECF system:

    M. Todd Scott, tscott@orrick.com
    Robert P. Varian, rvarian@orrick.com
    Spencer F. Smith, spencer.smith@mcafeetaft.com

                  /s/ Joshua D. Wells_____