# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

ALYECE CUMMINGS and DANIEL LAPKA, Individually and On Behalf of All Others Similarly Situated,

               Plaintiffs,

v.

CHESAPEAKE ENERGY CORP., et al.,

               Defendants.

**Case No.: 16-cv-00647-HE**

## DEFENDANTS' REPLY IN SUPPORT OF MOTION TO DISMISS AMENDED CLASS ACTION COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6) AND BRIEF IN SUPPORT THEREOF

## I.     INTRODUCTION

Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss Amended Class Action Complaint (the "Opposition" or "Opp.") offers nothing that undermines the demonstration made in the Motion.  Because the defects in the Complaint are irremediable, it should be dismissed with prejudice.

## II.     ARGUMENT

### A.     PLAINTIFFS CANNOT CIRCUMVENT THEIR LACK OF STANDING

The Opposition does not contest the fact that this lawsuit was filed by attorneys representing two small noteholders, without the knowledge, consent or support of the Trustee or any other noteholder.  Nor do Plaintiffs dispute their failure to satisfy the requirements of the Indenture's "no-action clauses" (§ 6.06), which are included in TIA-qualified trust indentures to protect the issuer and other noteholders against dissipation of assets via lawsuits filed on behalf of plaintiffs with a minimal stake in the outcome, without the support of the Trustee or other noteholders.  *See* Motion at 10-11.

As the *American Bar Foundation Commentaries* cited by the Tenth Circuit explain, the theory underlying the no-action clause is that if a lawsuit is worthwhile, the Trustee or 25% of the noteholders would be willing to support it.  Motion at 11.  The lack of merit in the lawsuit, and the fact that the price of the notes doubled after the Exchange Offer, make clear that this lawsuit is not worthwhile.

Although there was no prospect of obtaining the required support of the Trustee or 25% of the other noteholders, Plaintiffs' counsel filed it anyway, and attempted to circumvent the no-action clauses by claiming that they did not have enough time to comply with them.  *See* Compl. ¶ 178.  That is the only ground pled in the Complaint for evading the no-action clause (*see* Compl. ¶¶ 178-79 (under the heading "The No Action Clauses Do Not Bar This Action")), and the Motion demonstrated that it is baseless.  *See* Motion at 12-13.

OHSUSA:766125199.1

Rather than attempting the impossible task of defending the allegations of the Complaint, the Opposition attempts to chart a new course around the no-action clauses, relying on Section 316(b) of the Trust Indenture Act and the parallel Indenture provisions (§ 6.07). *See* Opp. at 19. That effort fails for two basic reasons. First, Plaintiffs cannot amend their Complaint in the Opposition. Second, the Complaint does not, and plainly cannot, plead a claim under TIA § 316(b) or Section 6.07 of the Indentures. *See* Motion at 16-19 & pages 3-7 below.

### B.   THE OPPOSITION DOES NOT ADDRESS PLAINTIFFS' FAILURE TO ALLEGE AN EVENT OF DEFAULT

The Motion (at pp. 4-5, 13-14) showed both that the Complaint failed to plead the existence of an Event of Default as defined in the Indentures, and that Chesapeake cannot be sued for a breach of the Indentures in the absence of an Event of Default. Plaintiffs do not address that demonstration, except to mischaracterize it as "a mere reiteration of" the argument that their claims are barred by the no-action clauses.

That effort fails because, as the Indentures themselves make clear, the Event of Default requirement is a precondition to filing suit irrespective of whether a claim is asserted by the Trustee, or by holders of 25% of the principal balance. In either case, a claim for breach of the Indentures can be asserted only if "an Event of Default occurs and is continuing." *See* Compl. Exs. A & K § 6.03. *See also id.*, § 6.01; Motion at 13-14.

### C.   THE OPPOSITION CONFIRMS THAT PLAINTIFFS CANNOT ALLEGE INJURY

As the Motion demonstrated (at pp. 14-15), the notion that Plaintiffs were injured by the Exchange Offer is refuted by the fact that they clearly benefitted from the Offer; the price of their notes doubled shortly thereafter. Unable to dispute that stark fact, the Opposition mentions it only in a footnote asking the Court to ignore it. [1] The Opposition further argues that the "value" of the notes was "reduced" because "the Class Notes . . . have been subordinated to the 2L notes," and if Chesapeake goes bankrupt in the future,

---

[1] Plaintiffs wrongly assert that the Court cannot consider the notes' market price as part of this motion. Opp. at 14, n.10. Those well-publicized market prices may be judicially noticed (*see* RJN at 1), a rule that Plaintiffs' Response to the RJN does not dispute.

that subordination could "impair[] the right of Plaintiffs . . . to receive interest and principal." Opp. at 11.[2]  That argument fails both because the market price of the notes unquestionably reflects their value,[3] and to avoid dismissal Plaintiffs must allege facts that "raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); the "mere possibility" of future injury is insufficient to state a claim.  *Id.* at 679.  Plaintiffs have pled no facts that indicate that Chesapeake is headed toward a bankruptcy, and the doubling of the price of their notes <u>directly refutes</u> any such suggestion.  Moreover, a majority of the holders of the "Class Notes" chose to retain them, rather than to participate in the Exchange Offer.

### D.    THE OPPOSITION'S ARGUMENTS RE TIA § 316(B) AND § 6.07 OF THE INDENTURES ARE FAR WIDE OF THE MARK

#### 1.    Plaintiffs Cannot Plead Impairment Of Their Legal Right To Payment

Plaintiffs' right to principal and interest when due was not impaired in any way, shape or form -- no matter how that right is defined.  *See* Motion at 16-19.  To the contrary, the Exchange Offer greatly <u>enhanced</u> Plaintiffs' ability to receive payment on their notes when due, and helped double their value.  While the lack of impairment is dispositive, Plaintiffs could not state a claim under TIA § 316(b) or Section 6.07 of the Indentures even if the Exchange Offer had made payment more (rather than less) difficult, or depressed the prices of their notes (rather than increasing them).  That is true as a matter of law.  *See* Motion at 18; page 2 above.

---

[2] None of the cases the Opposition cites in favor of this proposition (at 11-13) involves a situation like this, where the market price of the security in question went <u>up</u>.  To the contrary, Plaintiffs' cases acknowledge that "even where market price is not completely reliable, it serves as a good starting point in determining value."  *NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 165 (2d Cir. 2012).

[3] "The price of bond[] . . . reflects the present value of the expected future cash flow it generates, including periodic interest payments and the principal amount," and includes "the likelihood of ultimate repayment of the principal amount, *i.e.*, the likelihood of default of the issuing corporation."  *In re Healthsouth Corp. Sec. Litig.*, 261 F.R.D. 616, 631 (N.D. Ala. 2009).  *See also Bank of N.Y. Mellon v. Realogy Corp.*, 979 A.2d 1113, 1116 (Del. Ch. 2008) (low market prices is "evidence of the market's evaluation of Realogy's diminished prospects to pay back its debt").

OHSUSA:766125199.1

As the Motion showed, Section 316(b) and Section 6.07 protect against a forced alteration of the <u>legal</u> right to receive principal and interest <u>when due</u>, typically in the context of collective action by noteholders in a "cram down" restructuring of an issuer on the brink of bankruptcy. They do not apply to the vast array of corporate actions that might make it more difficult to receive payment, or to a noteholder's <u>practical</u> rights in that regard. *See* Motion at 6 & n.3, 16-19.

There is only one appellate decision addressing the scope of Section 316(b), and it is in the Tenth Circuit. *Brady v. UBS Fin. Servs.*, 538 F.3d 319 (10th Cir. 2008), makes clear that Section 316(b) and parallel indenture provisions apply only "to a holder's <u>legal</u> rights and not to the holder's <u>practical</u> rights." *Id.* at 1326, n.9 (emphasis added).

The only district court case within the Tenth Circuit to address the issue -- *YRC Worldwide Inc. v. Deutsche Bank Trust Co. Americas*, 2010 WL 2680336 (D. Kan. July 1, 2010) -- did exactly what the Court should do here. It held that under *Brady*, and the principal case cited in *Brady*, Section 316(b) did not apply because, "whatever its effect on the holders' ultimate <u>ability</u> to recover their investment," the actions at issue did not impair "the holders' <u>legal</u> rights to receive payments," or "to institute suit to enforce those payment obligations." *Id.* at *7 (emphasis added). Accordingly, it did not matter that the actions "might make it <u>more difficult</u> for holder to receive payment." *Id.* (emphasis added). In this case, there was no effect on Plaintiffs' legal rights, which would be dispositive, irrespective of the obvious increase in Plaintiffs' ability to recover their investment.

*Brady* and *YRC Worldwide* each cited, quoted and relied upon another decision, *In re Northwestern*, 313 B.R. 595 (Bankr. D. Del. 2004), which is significant in its own right, and because it was relied upon by the Tenth Circuit and a district court applying a Tenth Court decision. *See* Motion at 17-18. The Motion also relied on secondary sources cited in *Brady*. *See* Motion at 6, n.6 & 17, n.7.

Rather than acknowledging the Tenth Circuit's statement of an unequivocal legal rule, the Opposition undertakes a convoluted effort to distinguish *Brady* on its facts.

Opp. at 16.  *YRC Worldwide* is all-but ignored.  Although the case provides a template for how a district court in the Tenth Circuit should construe and apply Section 316(b), Plaintiffs mention it only in a footnote, without attempting to address the core of the decision or the Motion's discussion of it.  Opp. at 17, n.12.  Similarly, Plaintiffs barely mention *In re Northwestern*, despite the fact that it was cited, quoted and relied upon by the Tenth Circuit and the only district court decision in the Tenth Circuit that addresses Section 316(b) and related indenture provisions.

Plaintiffs cannot proceed as if these cases do not exist, because they prefer a handful of non-authoritative cases decided elsewhere.  Moreover, as discussed below, the cases cited in the Opposition provide no support for Plaintiffs' position.  The Complaint's attempt to plead claims under Section 316(b) and Section 6.07 would obviously fail miserably under those cases as well.

## 2. The Opposition Relies On Inapposite Cases That Underscore The Failure To State A Claim Under §§ 316(b) and 6.07

Even if Plaintiffs were correct that Section 316(b) of the TIA (and by extension Section 6.07 of the Indenture) protects a "practical" right to recover payments as they become due, the Complaint would fall <u>far</u> short of pleading a claim.  Even under the handful of S.D.N.Y. cases cited in the Opposition, "to prove an impairment under section 316(b), plaintiffs must prove either an amendment to a core term of the debt instrument, or an out-of-court debt <u>reorganization</u>" that leaves noteholders with "<u>no practical ability to receive payment.</u>"  *BOKF, N.A. v. Caesars Entm't Corp.*, 144 F. Supp. 3d 459, 468, 474 (S.D.N.Y. 2015); *Marblegate Asset Mgmt. v. Educ. Mgmt. Corp.*, 75 F. Supp. 3d 592, 614 (S.D.N.Y. 2014) (*Marblegate I*).

Moreover, the S.D.N.Y. cases make clear that Section 316(b) is limited to cases in which minority bondholders are victimized by collective actions undertaken by a majority of other bondholders.[4]  That element is also conspicuously absent here.

---

[4] Section 316(b) "allows for corporate flexibility while "protect[ing] minority bondholders against debt reorganizations resulting from a majority vote, outside of judicial supervision."  *BOKF*, 144 F. Supp. 3d at 473; *see also MeehanCombs Global*

Placing the burden on Plaintiffs to prove an amendment to a core term of the debt instrument, or a majority-led debt restructuring that effectively deprives non-consenting minority noteholders of the ability to recover principal and interest when due, supplies a "necessary limiting principle [to Section 316(b)] that averts the . . . specter of untrammeled judicial intrusion into ordinary business practice." *Marblegate I*, 75 F. Supp. 3d at 614.  Without this limitation, the TIA would "expose countless routine transactions that companies undertake without the unanimous consent of their creditors -- such as raising senior debt or other new funds; <u>exchange offers for existing debt</u>; ordinary sales of assets; or new investments -- as potential violations of the TIA." *BOKF*, 144 F. Supp. 3d at 474 (emphasis added; internal quotation marks omitted).

Furthermore under the S.D.N.Y. authority relied on by Plaintiffs, "cram down" out-of-court debt restructurings that might violate Section 316(b) have certain key characteristics, including the "restatement of assets and liabilities, . . . talks with creditors in order to make arrangements for maintaining repayments, and . . . [the] attempt to extend the life of a company facing bankruptcy through special arrangements and restructuring." *Id.* at 475.  The Complaint alleges none of these.[5]  *See* Compl. at ¶¶ 189-91.  Beyond the fact that it significantly enhanced Plaintiffs' ability to receive principal and interest when due, the Exchange Offer had none of the characteristics of the out-of-court debt restructurings contemplated by Section 316(b).  Nor was there any collective action by a majority of noteholders.  There indisputably was <u>no</u> action by <u>any</u> noteholders."  Motion at 19.   The Complaint does not -- and cannot -- allege that the

---

*Credit Opportunities Funds, LP v. Caesars Entm't Corp.*, 80 F. Supp. 3d 507, 516 (S.D.N.Y. 2015) (*MeehanCombs I*) (holding that TIA Section 316(b) was designed to prevent "an impermissible out-of-court debt restructuring achieved through collective action").

[5] Plaintiffs skirt the issue of whether a debt restructuring occurred at all, arguing that it "is not appropriate" to consider the issue on a Motion to Dismiss.  *See* Opp. at 18, n.13. Under the standard set by the Supreme Court in *Iqbal* and *Twombly*, Plaintiffs' complaint must be dismissed if it fails to allege "enough facts to state a claim to relief that is plausible on its face."  *Bell Atl.*, 550 U.S. at 570.  Plaintiffs have not met this standard.

noteholders played any role in connection with Chesapeake's decision to undertake the Exchange Offer, which, again, <u>benefitted</u> Plaintiffs.

Even when viewed as protecting against impairments of a "practical right" to payment, Section 316(b)'s reach is limited to a guard against majority-led, out-of-court workouts that deprive dissenting noteholders of the procedural and substantive rights they would receive in bankruptcy court. *See* Motion at 6, n.3; *see also Meehancombs Global Credit Opportunities Master Fund, LP v. Caesars Entm't Corp.*, 162 F. Supp. 3d 200, 208 (S.D.N.Y. 2015) *(Meehancombs II)*. The S.D.N.Y. cases cited in the Opposition hold that Section 316(b) is violated only where majority action strips minority noteholders of rights they would receive in bankruptcy court. *See Marblegate II*, 111 F. Supp. 3d at 556 (Section 316(b) was violated where instruments effecting an out-of-court workout were designed to make sure that any dissenting noteholders "will not receive payment on account of their Notes," and "gave dissenting bondholders a Hobson's choice: take the common stock, or take nothing"); *MeehanCombs I*, 80 F. Supp. 3d at 516 (plaintiffs stated a claim under Section 316(b) where defendant "stripped plaintiffs of [guarantees to the debt,] leaving them with an empty right to assert a payment default from an insolvent issuer); *Federated Strategic Income Fund v. Mechala Grp. Jamaica Ltd.*, 1999 WL 993648, at *7 (S.D.N.Y. Nov. 2, 1999) (success on the merits of a Section 316(b) claim was likely where defendant eliminated all guarantees on the notes and disposed of all meaningful assets, "effectively eliminat[ing] plaintiffs' ability to recover").[6]

Needless to say, Plaintiffs' situation does not bear the slightest resemblance to <u>any</u> of the extreme situations that impelled a handful of judges in the S.D.N.Y. to extend Section 316(b) to encompass a practical right to recover principal and interest when due.

---

[6] Plaintiffs inaccurately claim that *Oaktree Capital Mgmt., LLC v. Spectrasite Holdings, Inc.*, 2002 WL 32173072, at *4 (D. Del. June 25, 2002) "held that plaintiffs had a reasonable probability of success on the merits on their TIA claim." *See* Opp. at 18. To the contrary, *Oaktree* refused to decide the issue, stating, "the Court cannot conclude that Plaintiffs have an unreasonable probability of success on the merits." 2002 WL 32173072, at *4.

OHSUSA:766125199.1

Plaintiffs are not dissenting bondholders.  They are not being coerced to consent to anything.  Nor are they being left with an empty right to payment.

### E.     THE OPPOSITION CONFIRMS PLAINTIFFS' FAILURE TO PLEAD A BREACH OF § 4.09 OF THE INDENTURES

The Motion demonstrated that the Complaint fails to plead a breach of Section 4.09 because it does not allege <u>both</u> (i) that the liens at issue were not Permitted Liens, <u>and</u> (ii) that Chesapeake failed to comply with "the ACNTA test."  Motion at 21-23.  The Opposition concedes as much, admitting that the Complaint alleges only that "Chesapeake 'has not <u>disclosed</u> that it meets [the] ACNTA test."  Opp. at 20 (emphasis added).  Plaintiffs argue that "[s]ince Chesapeake did not disclose if" it met the ACNTA test, "the Exchange Offer did not fall within the exception set forth in section 4.09." *Id.* As the Motion demonstrated (and as the Opposition further concedes), section 4.09 does not contain a disclosure requirement.

Plaintiffs complain that the ACNTA test is "determined by non-public financial information" (Opp. at 20), but that does not alleviate their burden to allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Because the Complaint does not allege that Chesapeake failed to comply with the ACNTA test, it does not, as a matter of law, state a claim for breach of Section 4.09.[7]

### F.     THE OPPOSITION FAILS TO REFUTE THE MOTION'S DEMONSTRATION THAT PLAINTIFFS' PERIPHERAL CLAIMS ARE FATALLY DEFECTIVE

#### 1.     Covenant Of Good Faith And Fair Dealing

Plaintiffs assert that the Exchange Offer violated the covenant of good faith and fair dealing because it was made pursuant to Rule 144A, and was accordingly limited to QIBs.  *See* Opp. at 21.  Rule 144A is a well-recognized and widely used vehicle for conducting note exchange offers, and the Opposition cites no authority that might support

---

[7]   The Opposition's citation (at p. 21) to *Bank of N.Y. Mellon*, 979 A.2d  at 1128, is irrelevant, as that decision said nothing about pleading burdens <u>or</u> the ACNTA test.  In this case, the Complaint pleads that there is no breach of Section 4.09 absent a violation of the ACNTA test, and then fails on its face to plead an ACNTA violation.

the proposition that its use violates the indentures pursuant to which the underlying notes were issued.  Nor does the Opposition cite any authority that might support the broader proposition that all noteholders must "be treated equally," or *pari passu*.  *See* Opp. at 21 & 22, n.14.  That is because there is no such authority.  The two cases cited in the Opposition on this point underscore that fact.

The Opposition argues that *Whitebox Convertible Arbitrage Partners, LP v. World Airways, Inc.*, 2006 WL 358270 (N.D. Ga. Feb. 15, 2006), is critical of bondholders being treated "significantly differently," but the plaintiffs in that case alleged there had been a violation of the indenture's redemption provision.  *See id.* at *2-3.  Like the redemption provision in the Indentures, the provision required *pro rata* redemptions, not "equal treatment" generally.  *Id.* at 2.

The Opposition's citation of *Bank of N.Y. Mellon*, 979 A.2d 1113 (Del. Ch. 2008), for the proposition that "Defendants' argument that the Exchange Offer was permitted has been rejected under New York law in similar circumstances" (Opp. at 21) refutes Plaintiffs' positions.  The question is not whether the Exchange Offer "was permitted"; it is whether the Offer violates a provision of the Indentures.  Trust indentures set forth contractual limitations on the issuer's operation of its business -- not authorizations, and nothing in the Indentures contains any such limitation -- even by analogy.  *See* Motion at 19-20, 23.  *Bank of N.Y. Mellon* examined whether the actions at issue violated a credit agreement, and a specific limitation set forth in the indenture.  *See id.* at 1118-21, 1128.

Most important, the exchange offer in *Bank of N.Y. Mellon* was made pursuant to Rule 144A, and thus "excluded" non-QIBs.  *Id.* at 117 & n.3.  For good reason, no one so much as suggested that the use of Rule 144A or the limitation of the offer to QIBs was in any way inappropriate -- much less prohibited.

## 2.   Unjust Enrichment

As the Motion demonstrated (at p. 24), this claim is fundamentally misconceived for several reasons, including that the Exchange Offer did not take anything from Plaintiffs, enable Chesapeake to profit at their expense or deny Plaintiffs the benefit of

any bargain.  The Opposition argues that Exchange Offer "impaired Plaintiffs' rights to receive interest and principal," but the cases cited in the Opposition make plain that the notes' market price reflects Chesapeake's "prospects to pay back its debt," *Bank of N.Y. Mellon*, 979 A.2d at 1116, and the price of Plaintiffs' notes has more than doubled after the Exchange Offer completed.

### 3.    Declaratory Judgment

Finally, Plaintiffs' claims for declaratory relief must be dismissed because they lack standing to assert them, and the Complaint does not state an "actual controversy" within the meaning of Article III of the Constitution and 28 U.S.C. § 2201(a).

Neither the Trustee nor 25% of the other noteholders have declared an Event of Default, or have claimed that the Exchange Offer is ineffective.  Even Plaintiffs have not formally entered a notice of default or ineffectiveness, choosing instead to rely on their Complaint in this action to serve this purpose.   Under such circumstances, courts have consistently dismissed declaratory relief claims in cases for lack of standing.  *See, e.g.*, *Gardner & Florence Call Cowles Found. v. Empire, Inc.*, 589 F. Supp. 669, 675 (S.D.N.Y. 1984) (dismissing declaratory relief claim seeking declaration that transaction violated rights of noteholders under indenture because, among other things, plaintiffs did not obtain the requisite participation of 25% security holders, and because plaintiffs had not entered a formal notice of default, but merely filed a complaint), *vacated on procedural grounds*, 754 F.2d 478 (2d Cir. 1985).

## III.   CONCLUSION

The Opposition does not ameliorate the Complaint's many fatal and irremediable defects.  For the foregoing reasons, the Complaint should be dismissed with prejudice in its entirety.

OHSUSA:766125199.1

Dated:  December 5, 2016                    **ORRICK, HERRINGTON & SUTCLIFFE LLP**
                                            Robert P. Varian (Admitted *Pro Hac Vice*)
                                            M. Todd Scott (Admitted *Pro Hac Vice*)


                                            By:        */s/ Robert P. Varian*
                                                       ROBERT P. VARIAN

                                            The Orrick Building
                                            405 Howard Street
                                            San Francisco, CA 94105-2669
                                            Telephone: (415) 773-5700
                                            Facsimile:  (415) 773-5759
                                            rvarian@orrick.com
                                            tscott@orrick.com

                                            Spencer F. Smith, OBA #20430
                                            **MCAFEE & TAFT**
                                            211 North Robinson, Suite 1000
                                            Two Leadership Square, 10th Floor
                                            Oklahoma City, OK  73102
                                            Telephone.:  (405) 552-2246
                                            Facsimile:    (405) 235-0439
                                            spencer.smith@mcafeetaft.com

                                            *Attorneys for Defendants*

OHSUSA:766125199.1

## CERTIFICATE OF SERVICE

I, Robert P. Varian, hereby certify that on the 5th of December, 2016, I caused the attached document to be electronically transmitted to the Clerk of the Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the ECF registrants:

William B. Federman
wbf@federmanlaw.com

Joshua D. Wells
jdw@federmanlaw.com

Meagan A. Farmer
mfarmer@gardylaw.com

James S. Notis
jnotis@gardylaw.com

*/s/ Robert P. Varian*
ROBERT P. VARIAN

OHSUSA:766125199.1